# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 CR 128 - 5 | **DATE** | 12/14/2001 |
| **CASE TITLE** | USA vs. LAU MING | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   Defendant Lau Ming's motion for downward departure is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | 12-19-01 date docketed | |
| ✓ | Docketing to mail notices. | | 189 |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| CG | courtroom deputy's initials | date mailed notice | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

United States of America, )
)
)
Plaintiff, )
) No. 00 cr 128-5
vs. ) Judge Ronald A. Guzman
)
Lau Ming, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Having pled guilty, the defendant, Lau Ming, now comes before us moving for a downward departure in sentencing on the basis of diminished capacity.

### BACKGROUND

Defendant Lau Ming pled guilty to credit card fraud in October of 2000. Having incurred a gambling debt of approximately $10,000 he entered into an arrangement to work off his debt by engaging in a conspiracy to use counterfeit credit cards to make fraudulent purchases. Sometime in March or April of 1999 he began using counterfeit credit cards provided by fellow conspirator and co-defendant, Shou Mei. The arrangement, which seemed to change from time to time, was that he would receive credit towards the payment of his gambling debts for some percentage of the fraudulent purchases he made for Shou Mei. Defendant's participation in the counterfeit credit card conspiracy continued until Feb. 20, 2000, when he and several of his co-conspirators were arrested by the Secret Service. From April through June of 1999 Mr. Ming charged in excess of a $40,000 in fraudulent purchases for Shou Mei using dozens of different counterfeit cards provided by Shou Mei. It was his practice to limit the use of individual counterfeit credit cards to no more than $4000 in purchases in order to avoid credit limit

1

problems and detection by the credit card companies. He would also try out the credit cards at gas station purchases before making any substantial purchases.

Sometime in early June of 1999 defendant Ming attempted to recruit another person to join in the scheme. The new recruit was to "skim" credit card numbers from legitimate credit cards in order to aid in the production of the fraudulent cards. In order to prepare counterfeit Illinois drivers licenses to accompany the counterfeit credit cards digital photographs of the defendant and the other co-conspirators were taken. Defendant Ming had conversations with several people regarding the commencement of the fraudulent activities. On the date of his arrest the defendant met with Shou Mei and several others each of whom was handed approximately a half-dozen counterfeit credit cards with counterfeit Illinois drivers licenses to match. They then proceeded to a computer store where they used these counterfeit credit cards to purchase approximately $30,000 in goods. Mr. Ming charged approximately $11,500 with his fraudulent cards. The group presented itself as starting a new business. As they left the store with approximately $30,000 in total purchases - all with fraudulent cards, they were arrested by the Secret Service.

## DISCUSSION

Downward departures on the basis of diminished capacity are provided for in United States Sentencing Guidelines Section 5K 2.13. This section was amended in relevant parts on 11/1/98 in this manner:

> **Pre-amendment:** "If the defendant committed a nonviolent offense while suffering from significantly reduced mental capacity...a lower sentence may be warranted *to reflect the extent to which reduced mental capacity contributed to the commission of the offense*, provided that the defendant's criminal history...." *(Emphasis added)*

> **As amended:** "A sentence below the applicable guideline range may be warranted *if the defendant committed the offense while suffering from a significantly reduced mental capacity*...If a departure is warranted, *the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.(Emphasis added)*

**Commentary, Application Note 1:**

2

> A Significantly reduced mental capacity" means the defendant, although convicted, has a significantly impaired ability to (a) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; ***or (b) control behavior that the defendant knows is wrongful.****(Emphasis added)*

Defendant argues that this section as now amended no longer requires a direct causal relationship between the reduced mental capacity and the conduct which constitutes the offense. While clearly the language describing the causal relationship, i.e., "the extent to which reduced mental capacity contributed to the commission of the offense" has been reallocated within the definition, it does not follow that it has been eliminated. Both the old and new definition require the defendant to have committed the offense while suffering from a significantly reduced mental capacity and both require that any departure, or the extent of any departure, should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

Defendant also argues that the 1998 amendment to section 5k2.13 now includes "volitional" impairments as well as cognitive impairments. In other words, a significantly impaired ability to control behavior one knows is wrongful is now included in the definition of a significantly reduced mental capacity. Defendant relies upon the 6th Circuit's opinion in *United States vs. Sadolsky*, 234 F.3d 938, 942 (6th Cir. 2000). In *Sadolsky* the court found that because of the expanded definition of significantly reduced mental capacity to include volitional impairments, the definition now embraces pathological gambling disorder. Thus, a diminished capacity departure is no longer limited with defendant was unable to reason, but also includes the defendant who, even when his reasoning ability is unimpaired, is unable to control his conduct. *Sadolsky* also determined that Section 5k2.13 does not require a direct causal link between the crime charged and the volitional impairment. In *Sadolsky* the defendant resorted to computer fraud has a means to pay off his gambling debts, which were approximately $30,000. The *Sadolsky* court framed the "causal link" issue this way: "The Government contends that Sadolsky's gambling problem would only justify a downward departure if he had been arrested for gambling, rather than for fraud. More precisely, the Government argues that '[t]he question is whether this new volitional test requires that the defendant be unable to control the behavior that constitutes the crime, or whether it can be satisfied by an inability to control behavior that provides the motive for the crime.' " The Court concluded that: "The Guideline

3

language does not support the Government's argument. Section 5K2.13 does not distinguish between significantly reduced mental capacities that explain the behavior that constituted the crime charged and significantly reduced mental capacities that explain the behavior that motivated the crime." As examples of similar holdings the Sadowski court cited United States v. Harris, No. S192 CR. 455, 1994 WL 683429, at *4-5 (S.D.N.Y. Dec. 6, 1994) (citing two unpublished district court cases in the Second Circuit where compulsive gamblers were granted downward departures for crimes of embezzlement and mail theft to fund their gambling expenses); and United States v. McBroom, 124 F.3d 533 (3rd Cir 1997) at 548 n.14 (an SRMC "must be a contributing cause of the offense, but need not be the sole cause."); United States v. Cantu, 12 F.3d 1506, 1515 (9th Cir.1993) (stating that "other circuits are unanimous in holding that the disorder need be only a contributing cause, not a but--for cause or a sole cause, of the offense"). Since Sadolsky had "maxed out" on his own line of credit before committing the computer fraud offenses for which he was being sentenced, the court concluded that Sadolsky's gambling disorder was a likely cause of his criminal behavior. Thus the two-point reduction was found not to be inconsistent with the guideline provision.

In further support of his position defendant sites to the opinion of Judge Kennelly of the Northern District of Illinois in the case of United States vs. Roach, 2001 WL 664438 (N.D.Ill. June 4, 2001) (Kennelly, J.). In that case the defendant suffered from chronic depression which resulted in compulsive shopping binges to relieve her depression. Ultimately, she used fraudulently obtained money to pay her shopping debts and finance further such binges.

There's no dispute between the experts that the defendant, Mr. Lau Ming, suffers from a pathological gambling disorder as described in the Diagnostic and Statistical Manual of Mental Disorders-IV. The Diagnostic and Statistical Manual of Mental Disorders defines pathological gambling as "a continuous or periodic loss of control over gambling; a progression, in frequency in amount wagerred, and in the preoccupation with gambling and with obtaining monies, with which to gamble; and a continuation of the behavior despite adverse consequences." Both the defense expert, Christopher Anderson, a certified gambling counselor and the prosecution's expert, Dr. James L. Knoll, a qualified psychiatrist, agree that Mr. Ming suffers from this recognized mental disorder. Dr. Knoll, however, is of the opinion that the

4

defendant's condition is not related to the illegal activity he was convicted of. Essentially, Dr. Knoll reasons that although a pathological gambling disorder accounts for a compulsion to gamble, it does not entail a compulsion to steal anymore than it entails a compulsion to commit murder or stand on one's head on Main Street in the middle of rush hour. He is of the opinion that the defendant was not suffering from a significantly reduced mental capacity when he committed credit card fraud. He did not have a significantly impaired ability to understand the wrongfulness of his behavior *or* to exercise the power of reason *or* to control behavior that he knew was wrongful. Mr. Thomas, on the other hand, is equally convinced that a person suffering from a pathological gambling disorder sufferers not only from an impulse control disorder but also from extreme thought distortion.[1] Indeed, he believes that the end result of untreated pathological gambling is either prison, insanity, or death and that every pathological gambler will eventually turn to illegal activity if not first treated. He believes that a gambling addiction results in such a strong distortion as to lead to the inability to be able to tell right from wrong - although he admits there is no research to support this conclusion.

Essentially the issue before us is not one of forensic psychiatry, but rather of statutory construction. There is significant agreement on the key psychiatric issue in this case. The defendant suffered from a recognized psychiatric disorder which includes as its main component a compulsion to gamble. We reject Mr. Anderson's opinion, however fervently believed, that Mr. Ming's pathological gambling condition constitutes a "thought disorder" which prevented him or significantly decreased his ability to assess reality and distinguish right from wrong. Other than his own personal experiences as a recovering compulsive gambler, he gives no authoritative support for such a conclusion. That does not, however, end our consideration. We must determine if, as the *Sadolsky* court has determined, the fact that the defendant suffered from diminished capacity with respect to a motivating factor for the commission of the offense rather than a diminished capacity with respect to the offense conduct itself, qualifies the defendant for a downward departure under Section 5K 2.13 of the United States Sentencing

---

[1] Mr. Thomas testified that the defendant suffers from a "clinical thought disorder" although he had great difficulty providing a single succinct definition for this term. Dr. Knoll on the other hand, had no difficult referring to authoritative works and literature in establishing that pathological gambling does not rise to level of severity of a formal thought disorder.

5

Commission Guidelines Manual.

Our analysis begins with the language of the guideline. Section 5K2.13 requires that the defendant "committed the offense while suffering from a significantly reduced mental capacity." This language clearly implies a need for some sort of cause and affect relationship between the significantly reduced mental capacity and the commission of the offense. Otherwise, why would it matter that the defendant committed the offense while suffering from such a reduction in his mental capacity. Clearly, there must be some relationship between the reduced mental capacity and the commission of the offense. The prosecution argues, contrary to the conclusion in *Sadolsky*, that the relationship must be a direct one. This argument finds support in the language of Application Note 1 in the Commentary to Section 5K2.13 which defines a significantly reduced mental capacity as "a significantly impaired ability to (A) understand the wrongfulness of the ***behavior comprising the offense*** or to exercise the power of reason; or (B) control ***behavior*** that the defendant knows is wrongful. (Emphasis added) In so many words this definition tells us that a diminished ability to understand the wrongfulness of the behavior, the cognitive impairment prong, must relate directly to the behavior comprising the offense. The defendant must be suffering from a significantly impaired ability to understand that his criminal conduct is wrongful. As to this cognitive aspect therefore a diminished capacity to understand the wrongfulness of credit card fraud itself is required. It is not enough that the defendant have a diminished capacity to understand the wrongfulness of his actions which form the motive for the crime. In other words it is not enough that the defendant lacked the capacity to fully understand the wrongfulness of his gambling behavior, because that is not the behavior comprising the offense for which he stands convicted.

However, section (B) of this definition, the volitional impairment aspect, merely contains the words "behavior that the defendant knows is wrongful." It does not say the "behavior comprising the offense". If it did, our task would end here, for the very language of the statute would require a direct relationship between the defendant's diminished capacity to control himself and the criminal conduct of which the defendant was convicted. The fact that such language was not used could be construed to mean that the definition of behavior is expanded in this section and any related behavior is encompassed by the definition. Such a construction would make sense if coupled with the language in Section 5K2.13 which

6

indicates that the extent of the departure "should reflect the extent to which the reduced mental capacity contributed to the commission of the offense." This phraseology could be interpreted to imply a degree of flexibility between the offense conduct and the conduct as to which the defendant suffers a volitional impairment. It would then be the court's function on a case by case basis to determine how closely the offense conduct is related to the conduct as to which the defendant sufferers this volitional impairment, and, therefore, the extent -- if any -- of the downward departure warranted by this condition. Unfortunately, it can also be justifiably argued that this language refers to the degree of reduced mental capacity, and not to the degree of the relationship between the offense conduct and the conduct as to which the defendant suffers a volitional impairment. The prosecution argues that the defining language in section (A) must necessarily apply in section (B) as well; reasoning that there is no basis to conclude that the Sentencing Commission intended the word behavior to mean one thing with respect to cognitive impairments and something else with respect to volitional impairments. But, as previously noted, one could just as easily argue that the use of the limiting language in defining the term "behavior" with respect to cognitive impairments and the failure to use such language to limit the meaning of the word with respect to volitional impairments was intentional and signifies an intent to broaden the definition of the word.

It is this court's opinion that to construe Section 5K2.13 as excluding downward departure based upon a significantly reduced mental capacity to control behavior which constitutes a significant motive for committing crime would be unduly restrictive. It would unduly undermine the district court's discretion in sentencing one who suffers from a recognized psychiatric condition which contributed to the commission of the offense in the first place. Nor do we see a logical reason to do so. Clearly, the guideline allows the court to grant a downward departure based a significantly reduced mental capacity that is directly related to the conduct which comprises the offense. The difference between a mental condition that is directly related to the commission of the offense and one that is only indirectly related is merely a matter of degree. The sentencing Judge is in a position to take into consideration the strength of the relationship between the conduct as to which the defendant sufferers a significantly reduced mental capacity and the conduct for which the defendant was convicted as well as the degree of the defendant's mental incapacity. Indeed, the former may be an easier task than the latter.

7

We turn then to a consideration of the facts pertaining to the extent of the defendant's gambling compulsion (diminished capacity) and the relationship between his gambling compulsion and the crime of which he stands convicted, credit card fraud. Weighing in favor of a finding that there is a strong connection between gambling and the defendant's credit card fraud are the particular circumstances under which the defendant became engaged in the credit card fraud conspiracy. It was as a result of his large gambling debts that he was offered the opportunity to engage in the fraudulent conduct of his conviction. The involvement in the credit card scheme was offered to him as a way in which he could payoff the gambling debts which he otherwise lacked sufficient funds to pay. Further, gambling is a conduct which cannot be engaged in without money. In contrast, one can engage in compulsive thievery, for example, without money. The same can be said for sex offenses or compulsive violence, or pyromania, but not for gambling. In order to gamble one must have money or assets which can easily be converted to money. Thus, there is a close connection between the two different conducts in general.

On the other hand, the record contains evidence which undermines the strength of the connection between the defendant's compulsive conduct and his criminal conduct in the case at bar. First, the evidence strongly suggests the defendant had other means by which to earn the money to pay off his gambling debts. Indeed, he had done so in the past without resorting to theft or fraud. On prior occasions he managed to pay off a large debt in installments. His last such debt of $12,000 he paid off entirely in monthly installments, earning the money by working. This strongly suggests that the defendant is able to refrain from illegal behavior in order to earn money to pay off his gambling debts and therefore, that his volitional impairment is at best a quite indirect factor. It indicates that he had alternatives which did not involve illegal behavior and that therefore that the relationship between his criminal conduct and his compulsive behavior is not a strong one. Given other choices he simply chose to pay off his debt by criminal activity. To the extent that this is so, his criminal conduct was not caused by his compulsive gambling behavior.

Furthermore, the money which the defendant raised through his criminal conduct was not being used for the purpose of gambling, but rather to pay off an already incurred gambling debt. This is not a case in which the defendant was stealing money from day-to-day in order to feed a gambling habit. It

8

appears that a significant motivation for agreeing to the criminal conduct was not to facilitate his gambling habit, but rather to avoid physical harm from those to whom he owed money. In fact, according to Mr. Anderson, the defendant felt so threatened that he believed he had no choice but to agree to the credit card scheme. He remained frightened throughout the entire process and just did what he was told. There is no doubt that a significant motivation in this case was fear. There is no evidence to indicate that had defendant not felt threatened he would not have chosen, once again, to pay his debt off over time from his legitimate income. In making this observation we do not ignore the connection between the compulsion to gamble and the creation of the debt which in turn created the situation which placed the defendant in fear of being beaten by his gambling creditors. But we do point out that this is an indirect connection.

There is also evidence that he used the fraudulent credit cards not just for the purpose of paying off his gambling debt, but also to purchase gasoline and other personal items. This actually would be counterproductive to facilitating his gambling compulsion and constitutes yet a separate motive for the criminal conduct with little relationship to his gambling compulsion. He continued in the conspiracy from roughly April of 1999 until February 20, 2000 when he was arrested by the Secret Service. During that time he also engaged in attempting to recruit and instruct others in the workings of the scheme. To what extent if any such recruitment aided him in satisfying his debt or gambling compulsion is unclear. The very length of the defendant's fraudulent scheme in terms of time as well as the complexity of it, involving coordination with other individuals, the testing of the fraudulent credit cards at gas stations first, keeping track of the amounts charged to each card so as to be able to cease using it before it maxed out or was discovered and the elaborate production of the false identification with pictures of the different co-conspirators, all weigh against a finding that this was a desperate man reacting to a compulsion to gamble that had necessarily spilled over into other aspects of his life. The defendant's theory is contradicted by the evidence of his cooperation with and attempts to improve the workings of the conspiracy. There was, in our opinion, significant evidence of a rational thought process and multiple motives for the criminal conduct. His compulsive need to gamble was just a part of the causation.

9

Dr. Knoll's findings also tend to undermine the strength of the defendant's compulsion. For example, the five neurological tests administered by the psychologist, Dr. Hanlon resulted in test scores which indicated that the defendant scored in the "superior range" regarding ability to inhibit response and demonstrated an "advanced capacity" to control impulses. His personality assessment also revealed only mild psychological distress without any evidence of serious psychopathology. The tests further revealed no evidence of thought disorders, psychotic thought content, paranoia, cognitive dysfunction, marked anxiety, mood disorder, poor impulse control or substance abuse. The defendant himself told Dr. Knoll he had never suffered from any suicidal or, homicidal ideas, confused thinking, delusion or auditory or visual hallucinations. He also denied having experienced periods of impulsivity or inability to control behavior during non-gambling activities. He indicated that the time of the offense he was not suffering from any confusion, disorganized thinking, dilution or hallucinations. All of this was corroborated by the observations of the federal agents who arrested him. Further, he was able to refrain from gambling for six months at one point while he paid off his accumulated gambling debt.

## CONCLUSION

For the reasons stated above we are in agreement with the conclusions of the *Sadolsky* court that there need not as a matter of law be a direct connection between a volitionally based significantly reduced mental capacity and the behavior comprising the offense in order to qualify for a downward departure. It is enough that the evidence shows an inability to control behavior that provides the motive for the crime. However, in the case at bar we find that the extent to which the reduced mental capacity contributed to the commission of the offense is insufficient to warrant such a departure. A review of the evidence convinces us that the only substantial connection between the defendant's compulsion to gamble and the offense committed in this case is that the gambling was the cause of the defendant's debt. The crime, however, was not committed for the purpose of obtaining funds with which to gamble. That is to say, the crime was not committed for the purpose of satisfying the defendant's compulsion to gamble. The crime was only an indirect result of this compulsion. Thus, as pointed out above, the defendant's compulsion was only an

10

indirect motive - along with others - for the commission of the offense. Had the evidence proven a more substantial causal relationship such a departure might be warranted. For example, evidence of an established pattern of petty theft of cash which was immediately used to place bets, by a compulsive gambler with no other means of obtaining cash, might provide the basis for a downward departure. Even the *Sadolsky* court relied upon the fact that the defendant had "maxed out" on his own line of credit before committing the computer fraud offenses to justify the downward departure in that case. In the case at bar the money was not being used to gamble and we cannot say with any certainty that the defendant had no other means of obtaining the money to pay his debt. On previous occasions he had managed to do so without breaking the law. Further, the evidence shows other, more compelling motives for the offense in the case at bar. Certainly the desire to avoid physical punishment for his failure to pay is one such competing motive. The evidence also implies that this defendant viewed the fraudulent scheme as a means of obtaining money for purposes other than justs gambling. His attempts to advance the fraudulent credit card scheme by inducing and recruiting others to join the scheme and by making recommendations to Mei as to how to do things better lead us to believe that Mr. Ming's gambling compulsion was only one of the reasons he was engaged in this criminal enterprise. In short, the picture painted by the evidence is not one of a compulsive gambler being driven to steal for the purpose of supporting his gambling habit. Rather, the defendant's gambling compulsion was contributing factor to the situation which caused his dilemma, but only when combined with the presence of other factors, none of which qualify for consideration for a downward departure, did it "cause" him to commit the offense.

Finally, in denying the motion for downward departure, we also rely upon the evidence regarding the strength of the defendant's compulsive behavior. This comes from two sources. First, Dr. Knoll's extremely thorough and professional psychiatric evaluation resulted in test scores and clinical observations which tended to indicate that the defendant possessed a significant ability to ameliorate impulsive behavior. Second, the defendant's history shows that he can control his compulsive gambling for significant periods of time. Although Dr. Knoll did find that the defendant suffered from the volitional impairment of pathological gambling disorder, his examination and the evidence also revealed that the

defendant's lack of control, although significant, was far from complete. Therefore, defendant, Lau Ming's motion for downward departure is denied.

**SO ORDERED**             **ENTERED**: December 14, 2001

*[signature]*
RONALD A. GUZMAN
**United States Judge**